[Cite as *Moore v. Haldiman*, 2010-Ohio-4181.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| RANDOLPH W. MOORE, | ) | |
| | ) | |
| PLAINTIFF-APPELLANT. | ) | |
| | ) | |
| VS. | ) | CASE NO. 09-CO-11 |
| | ) | |
| RICH HALDIMAN, | ) | OPINION |
| | ) | |
| DEFENDANT-APPELLEE. | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from Court of Common
Pleas of Columbiana County, Ohio
Case No. 2006CV252

JUDGMENT:    Affirmed

APPEARANCES:
For Plaintiff-Appellant    Attorney Richard L. Goodman
720 Youngstown-Warren Road, Suite E
Niles, Ohio 44446

For Defendant-Appellee    Attorney Bruce M. Broyles
164 Griswold Drive
Boardman, Ohio 44512

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite

Dated: September 1, 2010

DONOFRIO, J.

{¶1} Plaintiff-appellant, Randolph Moore, appeals from a Columbiana

County Common Pleas Court judgment dismissing his complaint to dissolve the partnership he owned with defendant-appellee, Rick Haldiman, and granting judgment in favor of appellee on claims of breach of contract, wrongful withdrawal, and replevin.

{¶2} On September 26, 1999, the parties entered into a real estate purchase agreement for property in Columbiana for $50,000. Each party made a payment of $7,500 towards the down payment. On February 3, 2000, the parties entered into a partnership agreement forming R&R Land Clearing (R&R).

{¶3} R&R operated a wood waste recycling center on the property purchased by the parties. From 2000 to 2004, R&R purchased and/or leased various pieces of equipment that required financing. The financing was done through loans with financial institutions and were signed by each partner on behalf of R&R. Financing was also obtained by appellant and his wife by way of a home equity line of credit from Home Savings & Loan and a credit card from Household Credit. Whether these funds were used exclusively for R&R is a matter of dispute.

{¶4} After several disagreements between the partners, on July 13, 2005, appellant walked away from the partnership.

{¶5} On March 22, 2006, appellant filed a complaint for dissolution of the partnership. Appellee filed a counterclaim in response asserting claims for breach of the partnership agreement and wrongful withdrawal from the partnership.

{¶6} Appellant subsequently filed for Chapter 13 bankruptcy and a bankruptcy stay was placed on this case. The case was moved back onto the active docket on April 15, 2008. During the bankruptcy proceedings, appellant forced the sale of R&R's property, which was held in his and appellee's names.

{¶7} Appellee next filed an amended counterclaim adding a claim for replevin alleging that appellant had taken various pieces of equipment from R&R.

{¶8} The matter then proceeded to a bench trial. The main issue was the valuation of the partnership. Pursuant to the partnership agreement, when one partner withdrew, the remaining partner had the right to purchase the interest of the

withdrawing partner. The value of the withdrawing partner's interest was to be based on the net book value of the partnership as shown on the last regular accounting. Included in determining the net book value, issues involving R&R's debts and assets were addressed. Additionally, the parties addressed appellee's alleged losses.

{¶9} The trial court dismissed appellant's complaint. It entered judgment in favor of appellee on his counterclaim in the amount of $66,383.64. The court also ordered appellant to return certain property to appellee. In entering this judgment, the court adopted appellee's findings of facts and conclusions of law.

{¶10} Appellant filed a timely notice of appeal on May 22, 2009.

{¶11} Appellant raises four assignments of error. Each of appellant's four assignments of error asserts that findings of fact and conclusions of law are against the manifest weight of the evidence. Thus, the same standard of review applies to each assignment of error.

{¶12} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, at the syllabus. See, also, *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 226. The court "must indulge every reasonable presumption in favor of the lower court's judgment and finding of facts." *Gerijo,* 70 Ohio St.3d at 226, (citing *Seasons Coal Co., Inc. v. Cleveland* [1984], 10 Ohio St.3d 77). "In the event the evidence is susceptible to more than one interpretation, [the court] must construe it consistently with the lower court's judgment." Id. The rationale of giving deference to the findings of the trial court is that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations to weigh the credibility of the proffered testimony. *Seasons Coal Co.,* 10 Ohio St.3d at 80.

{¶13} Appellant's first assignment of error states:

{¶14} "CONCLUSIONS OF LAW 11 AND 12 HOLDING THAT THE HOUSEHOLD CREDIT CARD DEBT AND THE HOME SAVINGS & LOAN LINE OF

CREDIT ARE NOT PARTNERSHIP DEBTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THUS RESULTING IN A GROSSLY IMPROPER RECOMPUTATION OF NET BOOK VALUE."

{¶15} In this assignment of error, appellant takes issue with conclusions of law 11 and 12, which state, respectively:

{¶16} "11. The Household Credit Card debt is not a partnership debt."

{¶17} "12. The Home Savings & Loan line of credit is not a partnership debt."

{¶18} Appellee presented the expert testimony of Dennis Bella, a certified public accountant, who testified regarding R&R's net book value. Bella submitted a document listing the net book value and his calculations. (Ex. 2). Attached to this document was a list of R&R's debts. Included in the list of debts are a debt to Home Savings & Loan for $30,719.39 and a debt to Household Credit for $15,594.33.

{¶19} Based on the above, appellant argues that appellee, through his own witness, admitted that these two debts were R&R's debts. He points out that appellee was the one who provided the list of debts to Bella. (Tr. 146).

{¶20} Appellant further argues that he used a separate checkbook for the Home Savings & Loan line of credit to write checks for R&R. (Tr. 62). And he asserts that he submitted an explanation, supported by a copy of R&R's checkbook ledger, detailing the expenses paid by the Home Savings & Loan line of credit. (Ex. 5). Additionally, appellant asserts that he submitted credit card statements from the Household credit card evidencing that all purchases were for R&R and he made no personal purchases on this card. (Ex. 6).

{¶21} Appellant argues that the trial court erroneously found that there were no written documents supporting his position that the Home Savings & Loan line of credit and the Household credit card were used for R&R and not for his personal use. Citing Findings of Fact 33, 34, and 35.

{¶22} We must examine the evidence regarding the Home Saving & Loan line of credit and the Household credit card to determine whether it supports the trial court's findings.

{¶23} Appellant testified that he and his wife took out a home equity loan to provide money for R&R. (Tr. 35). He stated that this money had its own checking account and any time R&R needed money, he wrote a check and deposited it into R&R's business account. (Tr. 35, 62). Appellant stated that all of the money from the line of credit went into R&R. (Tr. 35-36, 61). Appellant testified that before applying for the line of credit, he and appellee discussed the bills R&R owed money on and the interest rates. (Tr. 61). He stated that he decided to take out the home equity loan because of its low interest rate. (Tr. 61). And he stated that his wife agreed. (Tr. 61). Appellant testified that although the checkbook for the line of credit was kept at R&R's office, appellee could not write checks on it because only appellant and his wife were authorized to do so. (Tr. 62). In support of his testimony that the money was used solely for R&R, appellant submitted a page from the checkbook ledger showing various bills that were paid. (Ex. 5). Additionally, appellant testified that up until he left R&R, the partnership made every payment on the home equity loan. (Tr. 136).

{¶24} As to the Household credit card, appellant submitted credit card statements showing various charges and payments. (Ex. 6). Appellant testified that his personal debts on this credit card were paid off before it was ever used by R&R. (Tr. 67). And he testified that he did not use the card for any personal expenses during the time it was used by R&R. (Tr. 67). In examining the credit card statements, however, the account holder is listed as "Randolph W. Moore" and states that he was a "Valued Cardmember Since 1989," well before R&R was formed.

{¶25} Appellant admitted on cross-examination that every other partnership debt was signed by both him and appellee. (Tr. 87-88, 96-102). He also admitted he did not provide the requested documentation to appellee to verify the debts incurred on the Household credit card and the Home Savings & Loan line of credit. (Tr. 111). He simply stated the paperwork was in R&R's office and he had no access to it. (Tr. 111).

{¶26} Dennis Bella testified that he sent a letter to appellant requesting that

he provide him with specific documentation for the Home Savings & Loan line of credit and the Household credit card evidencing what the money was used for. (Tr. 147; Ex. O). Bella stated that appellant never provided him the requested documentation. (Tr. 149-50).

**{¶27}** Appellee was the final witness on the subject. Appellee testified as to numerous debts incurred by R&R over the years and stated that both he and appellant signed for each one. (Tr. 241-49). Appellee further testified that he was unsure whether the Home Savings & Loan line of credit and the Household credit card were R&R's debt so he asked appellant to show him what the money was used for. (Tr. 261-62; Ex. M). But appellant never provided him with any such statements. (Tr. 265-66). Appellee stated that he had no idea what the money was used for. (Tr. 268). Appellee also testified that appellant merely mentioned the idea to him about taking out a line of credit on appellant's house and that was all. (Tr. 266-67).

**{¶28}** Appellee also explained why the Home Savings & Loan and Household debts were included on the list of debts he gave to Bella. He stated that at the time he gave Bella the list, he was not sure whether those two items were R&R's debts or not. (Tr. 278). Appellee stated that if they were verified as R&R's debt, he would have paid them. (Tr. 278). However, appellant never verified them. (Tr. 278).

**{¶29}** Given the above evidence, we cannot conclude the trial court's findings were against the manifest weight of the evidence. For instance, except for these two debts, every other debt incurred by R&R was signed by both appellant and appellee. This fact alone suggests that debts not signed by both partners were not partnership debts. Furthermore, appellee testified that he did not know what the money from these debts was used for.

**{¶30}** As to the Household credit card, it was titled in appellant's name only and he had owned this credit card for over ten years before R&R was even formed. Appellant offered no proof that the money owed on the Household credit card was exclusively R&R's debt. And while he submitted some credit card statements, there was nothing that linked the purchases to R&R. Appellant did not provide any

receipts. And he did not produce a statement to reflect that the credit card had a zero balance when he first started using it for R&R purchases.

**{¶31}** Likewise, appellant offered no proof that the money from the Home Savings & Loan line of credit was used exclusively for R&R. Appellant offered a copy of a checkbook ledger that he asserted evidenced that the money was used for R&R. However, nothing in the checkbook shows that the money came from the home equity line of credit. And appellant did not produce any receipts despite requests from both appellee and Bella. Furthermore, appellee testified that appellant took out this loan on his own after simply mentioning it to appellee.

**{¶32}** Based on the above, competent, credible evidence exists on which the trial court could have found that the Home Savings & Loan line of credit and the Household credit card were not R&R's debts.

**{¶33}** Accordingly, appellant's first assignment of error is without merit.

**{¶34}** Appellant's second assignment of error states:

**{¶35}** "CONCLUSION OF LAW 13 HOLDING THAT THE ASSET VALUE OF THE LAND OF THE PARTNERSHIP BE DEDUCTED FROM THE PARTNERSHIP ASSETS IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THUS RESULTING IN A GROSSLY IMPROPER RECOMPUTATION OF NET BOOK VALUE."

**{¶36}** Here appellant takes issue with conclusion of law 13, which states:

**{¶37}** "13. The calculation of the partnership's net book value was based upon a calculation which included the real property valued at $50,000.00 as an asset, as well as liabilities including the Household Credit Card in the amount of $15,594.33 and the Home Savings & Loan line of credit in the amount of $30,719.39. However, based upon the above findings that the Household Credit Card and the home equity line of credit were not liabilities of the partnership and accounting for the wrongful sale of the real property, that asset and those liabilities must be removed from the net book value calculation. Removing those liabilities and asset from the net book value calculation of Dennis A. Bella, the Court finds that as of July 13, 2005 the partnership

of R & R Land Clearing had a net book value of -$57,523.28 and that upon his withdraw from the partnership, Randolph W. Moore was required to pay R & R Land Clearing's remaining partner, Rick Haldiman $28,761.64."

{¶38} The parties agreed that the value of R&R's real estate was $50,000. Yet the trial court removed this asset from the computation of R&R's net book value. The trial court did so because it found that appellant forced the sale of the property and deprived appellee of its use.

{¶39} Appellant points out that the sale of the property did not occur until January 18, 2008. He further notes that the valuation for net book value of R&R was to be the value as of July 13, 2005, the day he left the partnership. Therefore, appellant argues that the trial court erred in not counting the value of the real estate in R&R's net book value.

{¶40} The evidence surrounding the property was as follows. Appellant and appellee purchased the real estate for $50,000. (Tr. 87, 236). Appellant and appellee each signed the mortgage individually, as they had not yet formed the partnership. (Tr. 87-88, 237). The property was titled in both of their names. (Tr. 118). Appellant and appellee made the initial down payment of $7,500 each, but the remaining payments were made by R&R. (Tr. 118, 236-37).

{¶41} Appellant testified that in his personal bankruptcy action, he filed an adversary proceeding to force the sale of the property even though he considered it a partnership asset. (Tr. 119-20).

{¶42} Appellee testified that the property was a partnership asset but that it was titled in his and appellant's names only because they never transferred it into R&R's name once they formed the partnership. (Tr. 272-73). He further stated that he fought the sale of the property because he was still running R&R there. (Tr. 288).

{¶43} The trial court's decision to exclude the land's value as a partnership asset was supported by the manifest weight of the evidence. Although the parties considered the land a partnership asset on the day appellant left the partnership, appellant later forced its sale thus depriving R&R of the use of the property.

Furthermore, as the parties agreed, R&R never actually owned the land nor did it appear as an asset on R&R's books. The land was always owned by appellant and appellee in their personal capacities. Consequently, because we must "indulge every reasonable presumption" in favor of the trial court's judgment, the trial court's decision to exclude the property's value from R&R's assets was not against the manifest weight of the evidence.

{¶44} Accordingly, appellant's second assignment of error is without merit.

{¶45} Appellant's third assignment of error states:

{¶46} "CONCLUSION OF LAW 7 HOLDING THAT MR. HALDIMAN INCURRED DAMAGES IN THE AMOUNT OF $15,900.00 AS A RESULT OF THE WRONGFUL DETAINER OF PARTNERSHIP PROPERTY BY MR. MOORE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶47} Here appellant takes issue with conclusion of law 7, which states:

{¶48} "7. R & R Land Clearing and Rick Haldiman incurred damages in the amount of $15,900.00 as a result of the wrongful detainer of the partnership property."

{¶49} This assignment of error addresses three separate pieces of equipment. Appellant contends that he did not remove any equipment from R&R with the intent to deprive appellee of its use. And he states that appellee never asked for the equipment back. Moreover, appellant asserts that once R&R's real estate was sold, the new owner notified the parties that if they did not remove R&R's equipment, there would be a monthly fee of $2,000. (Tr. 301).

{¶50} Appellant first contends that the trial court awarded appellee $3,200 in damages because appellee testified that he could have leased a Fecan Screener to a "guy just over the Pennsylvania line" for $3,000 to $3,200. Appellant argues that this testimony was too speculative for the trial court to base a damages award on.

{¶51} The trial court found that appellant had removed a Fecan 96 Screener from R&R's property. (Finding of Fact 22). This piece of equipment is used to make topsoil. (Tr. 250).

{¶52} Appellee testified that appellant took the Fecan Screener on January 31, 2008. (Tr. 249). Up until that time, R&R was using it. (Tr. 250). Appellee stated that R&R also rented it out to other businesses. (Tr. 250-51). In particular, appellee testified that he had a "guy" in Pennsylvania who wanted to rent the screener during the summer of 2008 for $3,000 or $3,200 per month, for a minimum of one month. (Tr. 251-52). However, by that time appellant had already taken the screener. (Tr. 250-51).

{¶53} Next, the trial court found that R&R and appellee had the opportunity to use a six-inch mole on at least two occasions, which would have produced income of $12,500. (Finding of Fact 26). A mole is a piece of equipment used to pound holes in the ground underneath roads. (Tr. 281).

{¶54} Appellee testified that R&R was using the mole up until the time that appellant took it. (Tr. 281). He further testified that he missed out on two jobs with the mole after appellant took it. (Tr. 282). Appellee testified that he was offered one job in Willoughby for approximately $10,000. (Tr. 282). He stated that he was offered another job by a Mr. Evans for approximately $2,000 to $2,500. (Tr. 283).

{¶55} Finally, appellant argues that appellee testified that he did not lose any money on a job involving a pump. (Tr. 284). Therefore, appellant contends the trial court's award for the pump was unjustified.

{¶56} The trial court awarded appellee $200 for having to rent a pump.

{¶57} Appellee testified that he had to rent a 2-inch pump for a week at a cost of $200. (Tr. 284). Appellee also testified that he did not lose any work because of having to rent the pump. (Tr. 284).

{¶58} The only testimony as to the lost income that resulted from appellant's removal of certain pieces of equipment from R&R came from appellee. Appellant did not dispute the above cited testimony by appellee. And while appellee's testimony could have been more specific, it nonetheless meets the "some competent, credible evidence" threshold for supporting the trial court's findings.

{¶59} The only testimony appellant offered on this subject was to admit that

he removed several pieces of R&R's equipment from the property. (Tr. 74). He stated that he did so because the new property owner informed him that it would start charging a monthly fee to keep the equipment on the property. (Tr. 75). However, at the time appellant removed the equipment, he was no longer a property owner or a partner in R&R. There was no dispute that the equipment appellant removed belonged to R&R.

**{¶60}** Accordingly, appellant's third assignment of error is without merit.

**{¶61}** Appellant's fourth assignment of error states:

**{¶62}** "CONCLUSION OF LAW 9 HOLDING THAT MR. HALDIMAN INCURRED DAMAGES IN THE AMOUNT OF $21,722.00 AS A RESULT OF THE LOST INCOME DERIVED FROM THE USE OF REAL PROPERTY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶63}** Finally, appellant takes issue with conclusion of law 9, which states:

**{¶64}** "9. As the direct and proximate result of the wrongful sale of the real property rightfully belonging to R & R Land Clearing, R & R Land Clearing and Rick Haldiman as the sole remaining partner, incurred damages in the form of lost income derived from the use of real property in the amount of $21,722.00 per year."

**{¶65}** The trial court made findings as to the amount of wood waste business that R&R had in 2006 and 2007 for allowing companies to dump wood waste on its property. (Findings of Fact 26 and 27). The total amount was $21,722.

**{¶66}** Appellant argues that these findings were supported only by appellee's recollection and not by any business records. Therefore, he contends they were too speculative for the trial court to base an award on. Furthermore, appellant argues that these figures were only for lost revenues, not lost profits. He contends that there was no certainty that appellee would have made any profit given the fact that R&R suffered only losses after he left the partnership.

**{¶67}** As noted above, appellant testified that he forced the sale of the R&R property during his personal bankruptcy proceedings. (Tr. 119-20). Appellee testified that he fought the sale of the property. (Tr. 287-88). He stated that R&R

was still using the property up until the time it was sold. (Tr. 288). As part of R&R's wood waste recycling, it had a permit issued by the Environmental Protection Agency to operate on its specific piece of property. (Tr. 273-74). Appellee then testified regarding the "tip fees" (fees charged for other companies to dump their wood waste on R&R's property) R&R charged in 2006 and 2007. (Tr. 289). He testified that for each of the years 2006 and 2007 for tipping: Columbiana County paid R&R $5,000; American Beauty paid R&R $1,200; Diamond Cut paid R&R $1,200; various lawn cutters paid R&R $4,320; and contractors, Elkrun Landfill, and Cox's Boxes paid R&R $10,000 to $15,000. (Tr. 289-94). However, appellee admitted on cross examination that he did not have anything in writing to corroborate his numbers. (Tr. 312-13). Appellee also testified that R&R did not have to do any work involving the tipping. (Tr. 290-94). The companies involved simply dumped their loads on R&R's property and paid R&R the tipping fee.

{¶68} Given this testimony, the trial court's judgment is not against the manifest weight of the evidence. As was the case in the previous assignment of error, appellant did not dispute any of the figures appellee provided regarding the money R&R lost resulting from appellant's actions. And because there were no costs to R&R, any money made from tipping was all profit. Additionally, R&R's EPA permit only permitted it to conduct its wood waste recycling on its specific piece of property. Consequently, the loss of the land directly cost R&R the loss of these profits. Furthermore, appellant did not contest the fact that he forced the sale of the property during his bankruptcy proceedings. Thus, the trial court's judgment is supported by competent, credible evidence.

{¶69} Accordingly, appellant's fourth assignment of error is without merit.

{¶70} In sum, competent, credible evidence supports each of the court's contested findings. Given the presumption that this court must apply in favor of the trial court's findings of fact, we cannot conclude that any of the court's findings are against the manifest weight of the evidence.

{¶71} For the reasons stated above, the trial court's judgment is hereby

affirmed.

Vukovich, P.J., concurs.

Waite, J., concurs.